**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

ACA INTERNATIONAL and FRESNO CREDIT BUREAU d/b/a CREDITORS BUREAU USA,

      Plaintiffs,

v.

ADMINISTRATOR OF THE UNIFORM CONSUMER CREDIT CODE, MARTHA FULFORD, in her official capacity,

      Defendant.

---

## COMPLAINT

---

1.    The topic of medical expenses elicits a strong emotional response. This is understandable, as compassion for anyone needing medical care is a laudable human reaction. The Colorado General Assembly, clouded by fervor rather than grounded in reason, enacted House Bill 23-1126 ("HB 23-1126"), codified at C.R.S. § 5-18-109(1)(f)(I), in 2023. In doing so, the Legislature overlooked the tremendous number of unintended consequences, harming medical providers and patients, that result from directing credit reporting agencies ("CRAs") to suppress truthful information about unpaid medical bills from consumers' consumer reports (colloquially known as "credit reports"). It also ignored the will of Congress and violated clearly established law.

2.    Not only is HB 23-1126 an illegal government infringement on speech, it outlaws what the Fair Credit Reporting Act ("FCRA") expressly allows: a national system that promotes the sharing of accurate, privacy-respecting credit information for the benefit of consumers and the

economy alike.

3.    HB 23-1126 suppresses medical debts from credit reports and hides from creditors over $1 billion that is owed to Colorado doctors, nurses, nursing homes, hospitals, ambulances, health clinics, and other medical services providers throughout Colorado.

4.    HB 23-1126 hurts patients and Coloradans more than it helps. Timely payment of medical bills directly supports our providers—the doctors, nurses, and hospitals that devote themselves to our health and care. Credit reports that convey information about medical bills are a critical part of the process to ensure that providers are fairly paid for their services. The economic consequences of promoting unpaid medical bills impacts the hiring market for physicians, the availability of services, the provision of services before payment in full, the speed of insurance payments, and the ability of small non-corporate providers to remain in business—an essential factor in ensuring that rural areas have access to healthcare. When politicians are driven by ideology, while overlooking the critical consequences in HB 23-1126, they disrupt a system that allows healthcare providers to get paid.

5.    Transparency regarding unpaid medical bills also helps creditors accurately assess a person's ability to repay other debts or take on new debt. The credit economy relies on that transparency and efficiency to make loans based on credit reports. Unreported debt can still be collected through litigation and other legal means, or drive a person to bankruptcy. Erasing a massive swath of debt information from the credit reporting system (estimated at 57 percent of all reported accounts) will make credit reports far less useful and reliable and could lead to flawed underwriting, similar to that which caused the 2007 Financial Crisis. Studies show the average person experiences a 25-point increase in their credit score in the first month after suppression of

medical debt, removing larger medical collections is correlated with even larger score changes.[1] With an improved credit score, a consumer can make additional purchases but still owes the same amount.

6.      Furthermore, HB 23-1126 causes a Colorado credit "downgrade" for all borrowers in Colorado—not just those who do not pay their bills. Because lenders cannot assess which Coloradans have unpaid debts that might get borrowers sued or drive them to bankruptcy, lenders assume that *all Coloradans* have a significant amount of unreported debt lurking on their balance sheets. This state-by-state mass alteration to the accuracy of credit reports turns the FCRA on its face and puts Colorado residents at a credit disadvantage.

7.      The FCRA is a statute intended to meet the needs of consumer credit for modern commerce in a manner that is "fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information . . ." 15 U.S.C. § 1681(b). HB 23-1126, however, mandates that CRAs suppress accurate information about consumer obligations and prevent relevant information from transferring between creditors and their agents, credit report users, and CRAs. By shutting down credit reporting, the Colorado Legislature has blocked the only legal avenue of conveying credit risk information between furnishers and lenders.

8.      By singling out adverse medical debt information for total suppression in nearly all credit contexts, while permitting the same speech about positive payments or, for a preferred purpose (large home transactions), Colorado has imposed a content- and purpose-based restraint

---

[1] Alyssa Brown and Eric Wilson, *Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports*, Consumer Financial Protection Bureau (Apr. 2023).

on truthful commercial speech. The law discriminates based on content, purpose, and even the identity of the listener—who may receive the information only if situated in a narrow class of transactions—while foreclosing other channels altogether. Such line-drawing fails any form of heightened scrutiny. The First Amendment protects not only the right to speak but the right to receive information, and HB 23-1126 violates both.

9.      Finally, HB 23-1126 is the top of a slippery slope of states banning reporting of certain categories of debt which sound good to voters. Why not ban reporting of a person's credit card  payment? Food purchased at the grocery store is just as essential as healthcare. This type of content-based prohibition not only violates the intent of the FCRA—which aims to create a nationwide, uniform system for sharing accurate credit information—but also imposes an undue restriction on speech. Moreover, it creates dangerous opacity in credit markets, which disrupts the entire economy.

10.      At a time when Colorado hospital finances are struggling and fewer physicians are entering healthcare practices, HB 23-1126 must be enjoined from continuing its effect for several important legal reasons:

- Because the Rule is content-based, purpose-based, not narrowly tailored, and prevents the communication of accurate information without a legitimate state interest, it violates the First Amendment;

- The FCRA's express preemption provision preempts Colorado from enacting laws that conflict with the FCRA's statutory text; and

- HB 23-1126 is preempted because it frustrates the FCRA's objectives of accuracy, fairness, and uniform national standards by removing federally authorized information.

Accordingly, Plaintiffs ACA International ("ACA") and Fresno Credit Bureau ("CBusa") bring this action for declaratory and equitable relief against Defendant, the Administrator of the

Uniform Consumer Credit Code, Martha Fulford, in her official capacity.

**I.**
**NATURE OF THE CASE**

11.    When, in 2003, Congress passed the Fair and Accurate Credit Transaction Act ("FACTA"), Pub. L. No. 108-159, 117 Stat. 1952, codified at 15 U.S.C. §§ 1681–1681x, which included provisions that expressly protected the content and use of medical information in credit reports, it balanced consumer protections with the need to support and protect the credit reporting system. It explained that in the preceding 30 years, the availability of non-mortgage credit to households in the lowest quintile of income had increased by nearly 70 percent. American families' ability to buy a home had also increased, with homeownership levels now approaching 70 percent—again with the largest gains achieved by lower income and minority groups. These improvements in the credit and mortgage systems saved consumers nearly $100 billion annually. Importantly, the congressional report explained that:

> This unprecedented "democratization" in the availability of credit to low- and moderate-income consumers has been made possible in significant measure by the emergence of a national credit reporting system.

Fair and Accurate Transactions Act of 2003, 108 H.R. REP. 263 at 23 (Sept. 4, 2003).

12.    HB 23-1126 threatens the usefulness of the national credit reporting system and will hurt ACA members (including CBusa) as well as healthcare providers, patients, and all those who rely on a transparent and efficient credit reporting system.

13.    This action seeks declaratory and injunctive relief to restore the federal balance and protect information transparency in financial services. Plaintiffs ask the Court to declare HB 23-1126 preempted and to hold that it violates the First Amendment. Enjoining enforcement of HB 23-1126 by Defendant will prevent further harm to ACA and its members from a law that

conflicts with federal standards and compromises the functionality of the credit reporting system relied upon by financial institutions, healthcare providers, and Colorado consumers.

## II.
## PARTIES

**A.    ACA International**

14.    ACA is a nonprofit corporation based in Minneapolis, Minnesota. Founded in 1939, as the American Collectors Association, ACA is best known for being the largest trade group for the debt collection industry. ACA also has members that are original creditors, asset buyers, attorneys, and vendor affiliates. ACA's members include sole proprietorships and small businesses like furniture stores, community credit unions, and third-party debt collection agencies. Its members include municipalities and state housing authorities. ACA members are also large corporations such as banks and credit unions who, for example, originate mortgages and auto loans and issue credit cards. In addition, ACA's members are creditors that advance services prior to payment, like home security companies, telecommunication firms, and educational institutions. ACA's members are vital to providing equitable and safe access to credit for American consumers.

15.    ACA's debt collector members work with consumers to resolve consumer debt, which saves every American household, on average, more than $700 each year. Kaulkin Ginsberg, 2020 State of the Industry Report, ACA Int'l (2020), https://bit.ly/3uxMcBC. ACA's members also help keep America's credit-based economy functioning with access to low-cost credit. For example, in 2018, the accounts receivable management industry returned more than $90 billion to creditors for goods and services the creditors had provided to customers. *Id.* These collections benefit consumers by lowering costs, particularly at a time when rising prices are hurting consumers throughout the country.

16.     ACA's debt collector members seek to recover unpaid past due amounts for services rendered—including for medical and hospital care. These ACA members acquire from healthcare providers a variety of data and information to document the services provided on the accounts that they collect. ACA members work with their healthcare clients to answer consumers' questions, resolve disputes, and arrive at achievable settlements and payment plans. And many ACA members furnish records to CRAs about consumers' payments on their accounts. These members previously engaged in these activities and have continued doing so following the enactment of HB 23-1126.

17.     ACA creditor members regularly rely on accurate and complete credit report information when determining whether to extend, renew, or continue credit. These members previously engaged in these activities and have continued doing so following the enactment of HB 23-1126.

18.     ACA's creditor and collector members have complied with the FCRA's medical information restrictions and its overarching federal credit reporting provisions since its enactment in 1970. Since HB 23-1126's effective date, ACA members have been financially harmed by HB 23-1126. Its medical service provider members and their collection agencies in Colorado have had millions of debts go unpaid, causing a direct impact to revenues. ACA's creditor members must make underwriting decisions with information that they know is inaccurate. This causes them to change credit standards, loss expectations, and pricing when they can no longer accurately assess nonpayment risks. And ACA members employ Coloradans who have decreasing access to care, experience higher healthcare costs, and may be asked to pay upfront for healthcare services that once were provided in advance of payment.

19.    ACA's CRA members have also complied with this state law that conflicts with the FCRA's medical debt permissions. Failure to comply with HB 23-1126 exposes these members to potential state enforcement actions and private litigation. Furthermore, ACA's creditor members have had their ability to receive accurate credit information directly impacted because CRAs are prohibited from reporting medical debt information under HB 23-1126.

20.    ACA's mission is helping members succeed in the accounts receivable management industry by providing the gold standard in advocacy, education, and resources. ACA routinely represents its members in federal litigation, including as parties and as amicus curiae. Many ACA members are based in Colorado or do business in Colorado.

21.    ACA has associational standing to bring this suit on behalf of its members who are adversely affected by HB 23-1126. Those members have standing to sue in their own right, the interests at issue are germane to the organization's missions, and the participation of an individual member is not required.

**B.    Creditors Bureau USA**

22.    Plaintiff Fresno Credit Bureau is a woman-owned business doing business under the name Creditors Bureau USA ("Cbusa"). CBusa's principal place of business is Fresno, California. CBusa is licensed to conduct its business in 34 states, including Colorado.

23.    CBusa has collected on 23,000 accounts in Colorado over its entire time active in the state, with roughly 900 accounts currently active. Nearly all of CBusa's creditor clients in Colorado are health care providers

24.    CBusa is regulated by the Consumer Financial Protection Bureau ("CFPB") under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 1692(p), the FCRA, and

the CFPB's implementing regulations of those acts (Regulations F and V), among other laws and regulations.

25. CBusa is also regulated by applicable Colorado statutes and regulations. Since HB 23-1126's effective date in August 2023, CBusa's revenues have decreased given that CBusa (and other collectors) may no longer rely on consumer reports to convey accurate information about unpaid medical debts to consumers and creditors.[2] This lack of reporting means consumers may not know of their debts and have less incentive to pay.

**C.** **Defendant**

26. Martha Fulford, sued in her official capacity, is the current Administrator of the Uniform Commercial Credit Code (the "Administrator").

27. The Administrator is appointed by and operates under the Colorado Attorney General's Office. C.R.S. § 5-6-103.

28. The Administrator is responsible for issuing rules and interpretations as well as enforcing compliance with the Uniform Consumer Credit Code, *see generally* C.R.S. § 5-6-101 *et seq.*, and the Colorado Fair Debt Collection Practices Act, *see* C.R.S. § 5-16-103. The Administrator is responsible for ensuring compliance with HB 23-1126 and may use all her authorities under Colorado law to enforce such compliance, including seeking penalties and injunctive relief.

**III.**
**JURISDICTION AND VENUE**

29. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C.

---

[2] Though HB 23-1126 only permits reporting of medical debt (as opposed to furnishing), a prohibition on either effectively closes all avenues of communicating consumer medical debts on consumer reports.

§ 1983 because Plaintiffs' claims arise under federal law and the U.S. Constitution.

30.    This action seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

31.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3). Plaintiffs conduct business in this District, and Defendant resides in this District, performs her official duties in this District, and a substantial part of the events or omissions giving rise to this action occurred or will occur in this District.

## IV.
## FACTUAL ALLEGATIONS

**A.**    **Congress Created a Uniform Federal Scheme for Reporting and Using Medical Debt**

32.    Enacted in 1970, the FCRA, 15 U.S.C. § 1681 *et seq.*, was designed to safeguard the privacy of individuals whose information is collected and disseminated by CRAs and to promote the accuracy of consumer reports. *See* Fair Credit Reporting Act, Pub. L. No. 91-508, 84 Stat. 1127 (1970). The statute establishes comprehensive standards governing the content of consumer reports and the permissible uses and disclosures of the information they contain. *See, e.g.*, *id.* §§ 604–10.

33.    For more than twenty-five years after its enactment, the FCRA did not specifically address medical debt information. That changed in 1996, when Congress amended the statute to prohibit CRAs from reporting a consumer's medical information without the consumer's consent. Economic Growth and Regulatory Paperwork Reduction Act of 1996 (Title II of Omnibus Consolidated Appropriations Act, 1997), Pub. L. No. 104-208, subtit. D, ch. 1, § 2405, 110 Stat. 3009–394 (codified at 15 U.S.C. § 1681b(g) (2000)).

34.    Congress revisited this issue in 2003 through FACTA. Pub. L. No. 108-159, 117

Stat. 1952 (codified at 15 U.S.C. §§ 1681–1681x (2003)). While maintaining the general restriction on the dissemination and use of consumers' medical information, Congress created a narrow exception: CRAs and creditors could utilize coded financial information related to medical debts. This adjustment reflected a deliberate balance—protecting sensitive health details while preserving the integrity and completeness of credit reporting. 15 U.S.C. §§ 1681b(g)(1)–(2).

35.    FACTA's provisions addressing medical debt appear in two distinct sections of the FCRA: one governing the conduct of consumer reporting agencies and the other regulating creditors.

36.    *First*, the statute expressly permits CRAs to furnish information about medical debt, provided that the information is reported in a manner that does not reveal the identity of the medical provider or disclose the nature of the underlying condition:

> A consumer reporting agency **shall not** furnish for employment purposes, or in connection with a credit or insurance transaction, a consumer report that contains medical information (other than medical contact information treated in the manner required under section 1681c(a)(6) of this title) about a consumer, **unless**. . . the information to be furnished pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devices, **where such information, other than account status or amounts, is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in section 1681c(a)(6) of this title.**

15 U.S.C. § 1681b(g)(1) (emphasis added).

37.    Section 1681c(a)(6) further prescribes how the name, address, and telephone number of a medical information furnisher must be coded to ensure that the codes "do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer[.]"

- 11 -

38. **Second**, FACTA added a corresponding provision for creditors, allowing them to use medical debt information in credit decisions when the information is properly coded:

> Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (**other than medical information treated in the manner required under section 1681c(a)(6) of this title**) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

15 U.S.C. § 1681b(g)(2) (emphasis added).

39. By expressly allowing the reporting and use of medical debt under specific conditions, Congress struck a careful balance between consumer privacy and the integrity of the national credit reporting system. That balance reflects a uniform federal standard—one that leaves no room for conflicting state laws that would prohibit what federal law permits.

**B.    Colorado's HB 23-1126 Imposes a Blanket Ban on Reporting Medical Debt**

40. Colorado enacted HB 23-1126, codified at C.R.S. §§ 5-18-103(11.5), 5-18-109(f)(I), during the 2023 legislative session and signed it into law on June 5, 2023. The law took effect on August 7, 2023, and established sweeping restrictions on the inclusion of medical debt in consumer credit reports within the state.

41. Unlike the FCRA, which expressly permits the reporting of coded medical debt information, HB 23-1126 imposes a categorical prohibition:

> [A] consumer reporting agency shall not make any consumer report containing any of the following items of information:
>
> > (f)(I) Any adverse item of information that the consumer reporting agency knows or should know concerns medical debt.

C.R.S. § 5-18-109(f)(I).

42. Under HB 23-1126, medical debt cannot appear on a consumer's credit report. The

prohibition applies automatically to CRAs operating in Colorado and does not require any consumer action to remove such debt.

43.    HB 23-1126 includes three exceptions. ***First***, the term "medical debt" does not include charges to a credit card unless the card was specifically opened for the payment of medical goods or services. C.R.S. § 5-18-103(11.5). ***Second***, reporting is permitted if the credit product connected to the request is for a transaction involving a "principal amount that exceeds the national conforming loan limit value for a one-unit property as determined annually by the Federal Housing Finance Agency." *Id.* § 5-18-109(f)(2). Practically speaking, this means HB 23-1126 permits the reporting of medical debt information if it is reported to a creditor, servicer, or other entity as part of a large, single-family home transaction. ***Third***, it allows reporting of positive or not-adverse information about medical debt. Thus, timely payment with a medical debt payment plan could be reported. Clearly, the second two of these exceptions are content-based.

44.    This state-imposed ban stands in stark contrast to the federal framework. Where Congress deliberately allowed the reporting and use of coded medical debt to preserve the integrity of the national credit reporting system, Colorado has chosen to prohibit it entirely. The resulting conflict is not theoretical; it strikes at the core of the uniform standards Congress enacted under the FCRA—a point underscored by the fate of a similar federal rule, which a federal district court vacated for the very same reason. *Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau*, No. 4:25-cv-16-SDJ, 2025 WL 1920148 (E.D. Tex. July 11, 2025).

C.    <u>The CFPB's Medical Debt Rule and Its Conflict with the FCRA</u>

45.    For more than two decades following the enactment of FACTA, CRAs and creditors operated under the FCRA's statutory framework—and its implementing regulations—

- 13 -

when reporting and considering coded medical debt in credit decisions. This framework provided clarity and stability, ensuring that medical debt information could be used in a manner consistent with federal law and consumer privacy protections.

46.    In January 2025, the CFPB threatened to disrupt that stability when it issued a final rule. The CFPB's rule barred CRAs from including medical debt information (coded or otherwise) in consumer reports furnished to creditors for credit determinations and likewise prohibited creditors from considering such information in making credit decisions (the "Medical Debt Rule" or the "Rule"). "Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information" (Regulation V), 90 FED. REG. 3276 (Jan. 14, 2025) (vacated July 11, 2025).

47.    A federal court vacated the Medical Debt Rule on July 11, 2025, finding it irreconcilable with the FCRA. *See Cornerstone*, 2025 WL 1920148.

48.    The court's decision to vacate the Medical Debt Rule rested on several fundamental conflicts between the Rule and the FCRA:

a.    ***It violated § 1681b(g)(1).*** Section 1681b(g)(1) permits CRAs to include a consumer's medical debt information in their consumer report, provided that the information is coded to hide the consumer's underlying health condition, procedure, and provider. The Medical Debt Rule contradicted the statute by "prohibiting CRAs from furnishing medical debt information to creditors, even coded information." *Cornerstone*, 2025 WL 1920148, at *9. Under the FCRA, Congress has authorized CRAs to furnish credit reports with medical information to creditors if "the information to be furnished pertains solely to transactions, accounts, or balances relating to debts," and if any identifying information is coded as § 1681c(a)(6) requires. 15 U.S.C. § 1681b(g)(1)(C).

The permissible purposes for furnishing this information are for use in "credit or insurance transaction[s]." *Id.* § 1681b(a)(3)(A). Congress imposed only one relevant statutory limit on such furnishing: a CRA must have "reasonable grounds for believing that the consumer report" will be used for "a purpose listed in section 1681b of this title." *Cornerstone*, 2025 WL 1920148, at *9 (citing 15 U.S.C. § 1681e(a)). The Medical Debt Rule's prohibition struck at the heart of Congress's design, replacing a clear statutory allowance with an outright ban. *Id.*

        b.     ***It violated § 1681b(g)(2).*** The Medical Debt Rule's conflict with § 1681b(g)(2) mirrored its conflict with (g)(1). Just as the FCRA generally prohibits CRAs from reporting medical information "unless" the information is properly coded to mask identifying health information, 15 U.S.C. § 1681b(g)(1)(C), the FCRA prohibits creditors from obtaining or using medical information "other than medical information treated in the manner required under section 1681c(a)(6)." *Id.* § 1681b(g)(2). The "manner required under section 1681c(a)(6)" is "using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer[.]" *Id.* § 1681c(a)(6)(A). In sum, the FCRA expressly allows creditors to obtain and use properly coded medical debt information in credit decisions, but the Medical Debt Rule prohibited them from doing so. *Cornerstone*, 2025 WL 1920148, at *10.

        c.     ***It unlawfully conditioned CRA reporting on state-law prohibitions.*** The Medical Debt Rule barred CRAs from reporting medical debt information if they had "reason to believe the creditor" is "otherwise legally prohibited from obtaining or using the

medical debt information, including by State law." 90 FED. REG. at 3278, 3374. The *Cornerstone* court held that this portion of the Medical Debt Rule appeared to be premised on an erroneous interpretation of 15 U.S.C. § 1681b(a). 2025 WL 1920148, at *12. § 1681b(a)(3)(A) permits CRAs to furnish consumer reports for a set of defined purposes, including for creditors to consider "in connection with a credit transaction involving the consumer on whom the information is to be furnished." "Because nothing in this section prohibits CRAs from furnishing consumer reports when medical debt information is not properly coded or when relevant state law applies, the Medical Debt Rule contradict[ed] section 1681b(a)." *Id.* at *12.

49.    The *Cornerstone* decision underscores a fundamental principle: when federal law expressly permits certain conduct, neither agencies nor states may forbid it. Colorado's HB 23-1126 does exactly that.

**D.    HB 23-1126 Is a Content-Based Restriction of Protected Commercial Speech**

50.    HB 23-1126 prohibits the communication of particular content (adverse medical debt information) for particular purposes (credit transactions *not* for a large home purchase).

51.    The information in question—adverse medical debt information[3]—is accurate information that is critical to credit and other financial decisions. HB 23-1126 includes no requirement that the suppressed information be inaccurate or disputed. HB 23-1126 did not articulate a legitimate state interest or substantial government purpose for its enactment.

52.    HB 23-1126 does not bar the reporting of positive information about medical debt

---

[3] "Debt charged to a credit card" (unless the credit card is issued specifically for the payment of health care services or goods) is excluded from the definition of medical debt and may be reported. C.R.S. § 5-18-10(11.5).

payments, *i.e.*, timely payments of amounts owed that concern medical debt. It only bars "adverse" items of information that the CRA knows or should know concerns medical debt.

53.     HB 23-1126 also provides a narrow carveout for reporting of adverse medical debt information if used for a transaction involving "a principal amount that exceeds the national conforming loan limit ("CLL") value for a one-unit property as determined annually by the Federal Housing Finance Agency." C.R.S. § 5-18-109(f)(2). This language is vague, as there is not a "national" conforming loan limit, but rather a "baseline" with exceptions. The FHFA actually publishes CLLs by county. As of filing, in most Colorado counties, the 2025 CLL value for one-unit properties is $766,550. In Denver County, the CLL limit is $816,500. The highest CLL in Colorado is in Eagle, Garfield, and Pitkin Counties at $1,149,825.

54.     As a result, CRAs may continue to communicate consumer debt information about other types of accounts, such as mortgages, credit cards, and housing rentals, and may still report medical debt information if it is communicated for a favored purpose (large home transactions). C.R.S. § 5-18-109(f)(2). But if a CRA attempts to communicate accurate adverse consumer medical debt information for any purpose, other than a large home transaction, the information is restricted.

55.     Practically speaking, HB 23-1126 employs a two-step process to determine the permissibility of reporting a consumer report's tradelines.

56.     *First*, one must review the *content* of the report. HB 23-1126's prohibition on medical debt reporting can only be effectuated by reference to the content of the underlying message. If two hypothetical credit reports exist, one with only mortgage-related tradelines and one with only medical-related tradelines, reference must be made to the *content* of the report (the

tradelines themselves) to determine the permissibility of the communication.

57.     **Second**, one must review the *purpose* of the report. Again, if two hypothetical reports exist, one intended for use in a transaction for a car loan, and one intended for use in a large home purchase, only the former report is a permissible communication under HB 23-1126.

58.     Because HB 23-1126 restricts consumer reports based on the content and purpose of their message, it follows that HB 23-1126, in practice, restricts information based on the identity of the listener. Only certain listeners—those operating in connection to a large home purchase—will ever be able to hear the speech in question. C.R.S. § 5-18-109(f)(2). A relatively small number of permissible listeners fall into that class, meaning that the already impermissible content and purpose-based discrimination also serves as a proxy for even more nefarious *listener*-based discrimination.

59.     Apropos to the instant Plaintiffs, debt collectors violate the FDCPA, 15 U.S.C. §§ 1692–1692p, if they publish a list of consumers who refuse to pay their debts other than to a CRA. FDCPA § 806(3) (banning "[t]he publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3)1 of this title."). Therefore, when HB 23-1126 restricts the reporting of medical debt information—which is in nearly every case—it does so categorically for every FDCPA-covered debt collector. HB 23-1126 forecloses all available avenues of communication and leaves no option for creditors, collectors, or others to exchange or obtain the information through other means.

60.     HB 23-1126 discriminates between favored and disfavored speech based on the content, purpose, and listener of the message. And where a message is disfavored, it is entirely

eradicated. Such subjective yet heavy-handed line-drawing by the Colorado government strikes the heart of the First Amendment.

61.     Plaintiff CBusa and Plaintiff ACA's members are harmed—as both speakers and listeners—by this restriction of speech. Unreported debts, medical or otherwise, are less likely to be collected, which directly reduces the revenues of Plaintiffs and Plaintiff ACA's members.

62.     Furthermore, the loss of a constitutional right, alone, is an injury that warrants redress by the courts. The "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976). ACA creditor members have a First Amendment right to receive protected commercial speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756 (1976). CBusa and ACA collector members have a right to speak—and hear—through the CRA channel. This right is violated each day that they cannot share or receive banned speech. Only by removing the curtailment of protected speech will Plaintiffs' constitutional rights be restored. Additionally, an injunction against enforcement of HB 23-1126 will serve the public interest, as "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012).

E.    **The FCRA Preempts HB 23-1126**

63.     Congress enacted the FCRA to establish uniform national standards for credit reporting, a system designed to avoid conflicting state rules that would fragment the market and undermine accuracy. HB 23-1126 does exactly what Congress sought to prevent: it imposes a state-specific prohibition on reporting medical debt, even when federal law expressly permits such reporting under defined conditions. That conflict triggers both express and implied preemption.

The FCRA's text and structure leave no room for state laws that regulate the same subject matter or frustrate Congress's objectives of accuracy, fairness, and national uniformity. HB 23-1126 is preempted for both reasons.

**(1)     HB 23-1126 Falls Within the FCRA's Express Preemption Provision**

64.     Congress added § 1681t(b), the statute's express preemption provision, to the FCRA so as to "avoid a patchwork system of conflicting regulations." *Ross v. F.D.I.C.*, 625 F.3d 808, 813 (4th Cir. 2010) (internal quotation marks and citation omitted).

65.     The FCRA's text makes clear that Congress expressly preempted state laws regulating the content of consumer reports as governed by § 1681c:

> (b) No requirement or prohibition may be imposed under the laws of any State—
>
> > (1) with respect to any subject matter regulated under—
> >
> > * * *
> >
> > > (E) section 1681c of this title, relating to information contained in consumer reports. . .

15 U.S.C. §§ 1681t(b)(1)(E).

66.     In this express preemption provision, Congress identified the exact subject matter that states cannot regulate: the content of consumer reports as governed by § 1681c. Section 1681c(a)(6), in turn, speaks directly on the reporting of medical information, demonstrating the depth of the conflict between HB 23-1126 and federal law.

**(2)     HB 23-1126 Bans Reporting of Coded Medical Information That Federal Law Explicitly Permits**

67.     The FCRA expressly preempts state laws that attempt to regulate the specific content of consumer reports that § 1681c addresses. As the Tenth Circuit explained, "The FCRA

**leaves no room for overlapping state regulations**. Congress set out to create uniform, national standards in the area of credit reporting, and the FCRA **expressly preempts any state requirement or prohibition relating to**, among other things, matters regulated under. . . § 1681c (**concerning the content of consumer reports**…).” *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 901 (10th Cir. 2012) (citing 15 U.S.C. § 1681t(b)(1)(E)) (emphasis added).

68.    Congress specifically "authorized" how medical information may appear in consumer reports, underscoring the federal scheme that HB 23-1126 disrupts:

**(a) Information to Be Excluded From Consumer Reports**

Except as authorized under subsection (b), no consumer reporting agency may make any consumer report containing any of the following items of information:

* * *

(6) The name, address, and telephone number of any medical information furnisher that has notified the agency of its status, unless—

(A) such name, address, and telephone number are restricted or reported using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer; or

(B) the report is being provided to an insurance company for a purpose relating to engaging in the business of insurance other than property and casualty insurance.

15 U.S.C. § 1681c(a)(6).

69.    Federal law authorizes CRAs to report coded medical debt information under this provision. HB 23-1126 forbids any item concerning medical debt, even when coded as federal law requires. Both provisions regulate the same subject matter: medical debt information in consumer reports. By banning what Congress expressly allowed under § 1681c(a)(6), HB 23-1126 conflicts

with the federal scheme and is expressly preempted under § 1681t(b)(1)(E).

**(3)    HB 23-1126 Replaces Congress's Permission for Coded Medical Debt Reporting Under § 1681b(g)(1) With an Absolute Ban**

70.    HB 23-1126 is conflict preempted because it prohibits conduct that federal law expressly permits. Under the FCRA, Congress authorized CRAs to include medical debt information in consumer reports when the information is properly coded to conceal the identity of the provider and the nature of services. *See* 15 U.S.C. § 1681b(g)(1)(C). This statutory authorization reflects Congress's deliberate choice to permit coded medical debt reporting rather than impose a categorical ban. HB 23-1126 replaces that federal balance with an outright prohibition, forbidding CRAs from reporting any adverse item concerning medical debt. As one court observed (albeit in dicta), "just as an agency cannot prohibit what a federal statute explicitly permits, neither can a state law. Accordingly, any state law purporting to prohibit a CRA from furnishing a credit report with coded medical information would be inconsistent with [the] FCRA and therefore preempted." *Cornerstone*, 2025 WL 1920148, at *10.

71.    Congress's intent is further confirmed by its selective approach to medical information restrictions. When Congress sought to bar certain medical information, it did so explicitly, such as in § 1681c(a)(7)–(8) for veterans' medical debt. These provisions demonstrate that Congress applied categorical bans where it deemed them appropriate, but chose to allow reporting of coded medical debt for non-veteran consumers. HB 23-1126 disregards that choice and imposes a broader prohibition than Congress enacted, creating a direct conflict with federal law.

**(4)    HB 23-1126 Is Preempted Because It Frustrates the FCRA's Objectives of Accuracy, Fairness, and Uniform National Standards by Removing Federally Authorized Information**

72.    HB 23-1126 is also preempted because it stands as an obstacle to the accomplishment and execution of Congress's objectives under the FCRA. Congress enacted the FCRA to ensure the accuracy and fairness of credit reporting and to require "reasonable procedures for meeting the needs of commerce for consumer credit." 15 U.S.C. § 1681. By banning all medical debt reporting, HB 23-1126 prevents CRAs from including accurate, federally authorized information in consumer reports. This undermines the ability of lenders and other users to assess a consumer's true creditworthiness and interferes with the uniform national system Congress designed.

73.    The FCRA reflects a careful balance between protecting consumer privacy and preserving the integrity of credit reporting. Congress implemented that balance by allowing coded medical debt information to appear in consumer reports. HB 23-1126 disrupts this balance and frustrates the federal scheme by eliminating information Congress intended to permit. As a result, the state law obstructs the methods Congress adopted to achieve its goals and is impliedly preempted.

74.    HB 23-1126 cannot coexist with the FCRA. By prohibiting the reporting of medical debt information that federal law expressly authorizes, the statute is preempted under both express and implied principles. It conflicts with Congress's comprehensive scheme for consumer report content and frustrates the objectives of accuracy, fairness, and national uniformity.

**F.    The CFPB Confirms the FCRA's Broad Preemption Authority**

75.    The CFPB is an independent agency under the Federal Reserve that administers

- 23 -

and enforces federal consumer protection laws. *See* 12 U.S.C. § 5491(a).

76.    When Congress enacted the FCRA, rulemaking and enforcement authority primarily rested with the Federal Trade Commission ("FTC") under its administrative powers in 15 U.S.C. § 1681s(a). That framework remained in place until the passage of the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank") in 2010, which created the CFPB. Dodd–Frank transferred all "consumer financial protection functions," including rulemaking authority under federal consumer financial laws, from agencies such as the FTC to the CFPB. *See* 12 U.S.C. § 5581(b)(5). Dodd–Frank further designated the FCRA as one of the enumerated consumer laws in which authority was transferred. 12 U.S.C. § 5481(12)(F).

77.    Following this statutory realignment, Congress codified the CFPB's FCRA rulemaking authority within the FCRA itself. Under 15 U.S.C. § 1681s(e)(1), the FCRA now provides that:

> The Bureau shall prescribe such regulations as are necessary to carry out the purposes of this subchapter. . . The Bureau may prescribe regulations as may be necessary or appropriate to administer and carry out the purposes and objectives of this subchapter, and to prevent evasions thereof or to facilitate compliance therewith.

78.    The CFPB codifies the rules it promulgates under the FCRA in 12 C.F.R. Part 1022 (Regulation V), which serves as the regulatory framework through which the CFPB implements the FCRA.

**(1)    The CFPB's 2025 Interpretive Rule Reinforces the Need for Uniform National Standards and Warns Against a Patchwork of State Laws**

79.    On October 27, 2025, the CFPB issued an interpretive rule (the "2025 Rule") clarifying that "the FCRA generally preempts state laws that touch on broad areas of credit reporting, consistent with Congress's intent to create national standards for the credit reporting

system." "Fair Credit Reporting Act; Preemption of State Laws," 90 FED. REG. 48710 (Oct. 27, 2025) (to be codified at 12 C.F.R. pt. 1022). The 2025 Rule replaced a July 2022 interpretive rule that the CFPB withdrew in May 2025, which read § 1681t(b), the FCRA's express preemption provision, narrowly. *Id.* The 2025 Rule emphasizes that "[t]he 2022 interpretive rule contradicted the plain text of section 1681t(b)(1), ignored the legislative history of the preemption clause, and reflected a misguided policy choice that would undermine the credit reporting system and credit markets." *Id.* at 48712.

80.    The 2025 Rule does more than correct a prior misinterpretation—it underscores the policy rationale behind Congress's decision to enact broad preemption under § 1681t(b). Specifically, the CFPB explained that Congress intended "broad preemption" to "'allow businesses to comply with one law on credit reports rather than a myriad of State laws,' thereby 'benefit[ting] consumers and businesses.'" *Id.* at 48714 (quoting 140 Cong. Rec. 25867 (Sept. 27, 1994) (Rep. Thomas)). "In other words, the preemption clause was specifically intended to avoid 'a patchwork of State laws.'" *Id.* (quoting 140 S. 8942 (Sen. Bryan May 2, 1994)).

81.    The 2025 Rule further warned that ignoring this intent would invite "50-plus State regulatory regimes governing credit reporting in addition to the national standards established by Federal law." *Id.* Such fragmentation would impose "substantial compliance costs on consumer reporting agencies, users of credit reports, and furnishers of credit report information, turning what is currently a cohesive national market into dozens of regional markets. It would lead to 'a patchwork system of conflicting regulations,' which the preemption clause was meant to 'avoid.'" *Id.* at 48714–15 (citing *Ross*, 625 F.3d at 813).

82.    The CFPB explained that this disunity would distort the content of credit reports

themselves: "The content of a consumer's credit report could vary depending on the State in which they resided. Thus, instead of the unified national credit market that we have today, lending and underwriting decisions would have to be based in part on where a borrower lives, since the information available to a creditor making a lending decision could be better or worse depending on the borrower's State." *Id.* at 48715.

83.    That variability would undermine the portability and reliability of credit information, leaving consumers "stuck with the credit options where they live" and likely increasing the cost of credit. *Id.* The CFPB also highlighted the systemic risks of fragmented regulation, noting that lenders unable to identify risk accurately may "charge more for credit in the States where regulation diverges from the national standard in order to account for the reduced accuracy of credit reports in those States." *Id.*

84.    These policy concerns reinforce why Congress enacted a uniform federal framework for credit reporting. HB 23-1126 creates precisely the patchwork Congress sought to avoid, confirming that it is preempted under the FCRA.

### G.    Continued Enforcement of HB 23-1126 Would Cause Irreparable Harm to Multiple Types of Parties

85.    **Creditors.** "Creditors" affected by HB 23-1126 are any person who arranges for or regularly extends, renews, or continues credit and any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.[4] Creditors also include service providers who provide benefits to consumers in advance of payment (*i.e.*, any service provider that

---

[4] 12 C.F.R § 1022.30(b)(2)(ii) (defining "creditor" with reference to Equal Credit Opportunity Act, 15 U.S.C. § 1691a(e), which states, "[t]he term 'creditor' means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.").

bills in arrears). ACA creditor members like banks, fintech lenders, and utilities providers regularly review credit information on credit reports to extend, renew, or continue credit. Thus, these lenders, their account servicers, and any party that provides services in advance of payment will have no record from credit reports that a consumer has an amount past due that is owed to a medical service provider.

86.     Suppression of medical debt information affects approximately 57 percent of the potential tradelines on consumer reports. Said otherwise, HB 23-1126 hides over half of the unpaid debts that Coloradans owe to creditors.

87.     A CFPB study found that credit scores rise significantly when adverse information about medical debts is suppressed on the credit reports that underly the scores. *Supra* n.1. Other studies by CRAs and the leading credit score provider Fair Isaac Corporation ("FICO") show that information about unpaid medical debt has predictive value and suppressing the information leads to less accurate credit reports and scores, and less accurate comparisons between borrowers.

88.     HB 23-1126 impedes accurate underwriting and exposes creditors to financial losses on both an individual level but also systemically as the credit system fails due to widespread information gaps when over half of tradelines and account data from a patchwork of American credit reports are suddenly hidden.

89.     **Healthcare Providers.** In general, medical debt amounts to about $49 billion in funds that are currently owed to American doctors, nurses, nursing homes, hospitals, ambulances, health clinics, and other medical services providers throughout the U.S.[5] The deterrent effect of

---

[5] Consumer Financial Protection Bureau, *Market Snapshot: An Update on Third-Party Debt Collections Tradelines Reporting* (Feb. 2023), https://files.consumerfinance.gov/f/documents/cfpb_market-snapshot-third-party-debt-collections-tradelines-reporting_2023-02.pdf.

the risk of credit reporting allows providers to collect another outstanding $200 billion. Colorado is no different than national trends. Doctors and hospitals who engage ACA's debt collector members can no longer rely upon the concern about a negative trade line reporting to ensure they are paid for services provided in advance of payment.

90.    Data from multiple sources—including the CFPB—shows that amounts collected drop when accurate account information is suppressed from credit reports. This makes logical sense, as well. Credit reports are a private and accurate way to convey to consumers the final and definitive amount owed arising from a complicated billing system. Without this communication method, consumers remain in the dark and bills go unpaid. Credit reports also motivate payors to timely act to avoid negative repercussions from delayed debt payments.

91.    **Debt Collectors**. ACA members that collect medical debt have incurred costs—and will incur more costs—to adjust systems of record, enhance contact campaigns, modify disclosures, processes, and employee training in reaction to HB 23-1126. HB 23-1126 required contracts with customers to be revised and renegotiated. Further, if Defendant enforces HB 23-1126, they must pay administrative costs, legal fees, and examination fees related to law enforcement.

92.    Second, when debt is hidden from credit reports, and consumers do not pay their obligations to avoid credit reporting, collectors must enhance use of other motivation methods—namely, contact campaigns and litigation. ACA members in Colorado and in states with laws similar to Colorado report that since they were no longer able to motivate debt payments by negative credit reporting, the ACA members have had to increase outbound contacts to consumers and they are more likely to file debt collection lawsuits against consumers. Medical debt collection

lawsuits in states that suppress credit reporting are being filed sooner in the debt cycle and to collect lower amounts than when the debt was reported. That is, consumers who would have been immune from lawsuit for unpaid medical bills are now facing litigation earlier and for lesser amounts. Litigation is expensive for businesses and consumers and it imposes costs on the court system as well. All parties incur legal costs that would not otherwise be spent if a consumer repaid debt to avoid credit reporting.

93.      Debt collectors have lost and will continue to lose the fees they otherwise would have collected on account recovery income—usually based on a percentage of actual receipts. Some agencies have or may stop doing business in Colorado due to HB 23-1126. ACA members who engage in the collection of medical accounts have already experienced significant revenue losses due to state law activities regulating this area. For example, from 2020 until HB 23-1126's effective date in August 2023, Plaintiff CBusa's Colorado recovery rate averaged 33 percent. This was a time when CBusa could furnish medical debt information to CRAs and CRAs could then report that information on consumer reports. But after HB 23-1126's effective date, CBusa's collection rate dropped by more than half to 12.5 percent.

94.      This drop in collections impacts both debt collectors and their clients. Nearly all of Plaintiff CBusa's clients in Colorado are health care providers. When CBusa cannot collect on validly owed medical debts because those debts are not reported on consumer reports, the health care providers relying on these collections do not get paid. Increasingly, CBusa reports that health care providers are interested in resorting to litigation, as opposed to consumer reporting, to recover these debts.

95.      Furthermore, because some credit information furnishing systems do not allow a

debt collector to choose between medical and non-medical accounts for furnishing, debt collectors have stopped furnishing many other types of non-medical debt, which also reduces collections on non-medical files and harms the collectors and creditors further.

96.     Each of these harms is directly traceable to HB 23-1126 and would be remedied by an order enjoining the rule from enforcement and finding it preempted by the FCRA.

97.     Finally, ACA creditor members have lost their First Amendment right to receive medical debt information from CRAs. Consumers have also lost their First Amendment right to receive furnished information about medical debt amounts they owe to creditors—communication that enables them to avoid other negative consequences. And furnishers lose their right to convey information about medical debt to other creditors and consumers via the CRA channel. This curtailment of rights amounts to irreparable harm.

## V.
## CLAIMS FOR RELIEF

### COUNT I
### Declaratory Relief
### (Federal Preemption)
### 28 U.S.C. §§ 2201, 2202; U.S. CONST. art. VI, cl. 2.

98.     Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if set forth fully herein.

99.     The parties in this action are adverse and there is an actual controversy because they disagree as to whether HB 23-1126 is (1) preempted by the FCRA and (2) can be complied with and enforced.

100.    Defendant has made it her unambiguous intention to enforce HB 23-1126.

101.    The respective rights of the parties, as to whether HB 23-1126 is enforceable, must

be determined.

102.    The foregoing issues are ripe for judicial determination because there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

103.    Plaintiffs will suffer immediate and irreparable harm if they are forced to comply with HB 23-1126, which is preempted by the FCRA. The Court's favorable determination concerning the federal preemption and declaratory relief issues will prevent this harm.

104.    Plaintiffs seek a declaration that federal law preempts HB 23-1126. Congress enacted the FCRA to establish "uniform, national standards in the area of credit reporting," and the FCRA "leaves no room for overlapping state regulations." *Consumer Data Indus. Ass'n v. King,* 678 F.3d 898, 901 (10th Cir. 2012). The "FCRA expressly preempts any state requirement or prohibition relating to, among other things, matters regulated under. . . § 1681c (concerning the content of consumer reports. . . )." *Id.* (citing 15 U.S.C. § 1681t(b)(1)(E)).

105.    HB 23-1126 imposes a categorical ban on reporting medical debt, directly regulating content that Congress addressed in §§ 1681t(b)(1)(E) and 1681c(a)(6). Federal law permits CRAs to report coded medical information, yet HB 23-1126 forbids it. HB 23-1126 conflicts with Congress's comprehensive scheme and frustrates the objectives of accuracy, fairness, and national uniformity, and is therefore preempted under both express and implied principles.

106.    Accordingly, Plaintiffs request that the Court declare that:

        d.    HB 23-1126 is expressly preempted by 15 U.S.C. § 1681t(b)(1)(E);

        e.    HB 23-1126 is expressly preempted by 15 U.S.C. § 1681c(a)(6); and

f.    HB 23-1126 is impliedly preempted by the FCRA.

107.    Plaintiffs have been forced to retain counsel to prosecute this action and are thus entitled to an award of attorneys' fees and costs as provided by applicable law.

**COUNT II**
**First Amendment**
**(Restriction of Speech Based on Content)**
**U.S. CONST. amend. I**

108.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if set forth fully herein.

109.    HB 23-1126 prohibits CRAs from reporting medical debt information for certain purposes—purposes that are often necessary to Plaintiffs' and Plaintiff ACA's members' businesses. Plaintiffs and Plaintiff ACA's members are harmed by this restriction of speech. Unreported debts, medical or otherwise, are less likely to be collected, which directly impacts the revenues of Plaintiffs and Plaintiff's members.

110.    42 U.S.C. § 1983 allows suit to protect the right to be free from state actions that violate the First Amendment of the United States Constitution. U.S. CONST. amend. I.

111.    The First Amendment proclaims that "Congress shall make no law . . . abridging the freedom of speech." *Id.* State governments are subject to this prohibition through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

112.    "It is now well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists, as is the case here, the protection afforded is to the communication, **to its source and to its recipients both**.") (emphasis added).

- 32 -

113.    State governments have "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Critically, "[c]ommercial speech is no exception" to the First Amendment. *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 566 (2011); *Aptive Env't, LLC v. Town of Castle Rock, Colo.*, 959 F.3d 961, 979 (10th Cir. 2020).

114.    Laws that "target speech based on its communicative content . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interest." *Reed*, 576 U.S. at 163. Moreover, "in the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 566.

115.    A government restriction of protected speech will not be narrowly tailored—and thus fail a strict scrutiny analysis—when it is "hopelessly underinclusive" and fails to limit similar activities that "create the same problem." *See Reed*, 576 U. S. at 171. Relatedly, a restriction of protected speech fails when it is overinclusive and fails to narrowly tailor the restriction to the purported harm." *See id.* at 171 ("The restrictions do not survive strict scrutiny; the town has not demonstrated that differentiation between temporary directional signs and other signs furthers a compelling governmental interest and is narrowly tailored to that end.").

116.    HB 23-1126 is content-based because it prohibits the communication of particular content (adverse medical debt information) for particular purposes (credit decisions *not* for a large home purchase). C.R.S. § 5-18-109(f)(2). CRAs may continue to communicate information about other types of accounts, such as mortgages, most credit cards, and housing rentals and may report medical debt information if communicated for a favored purpose (large home transactions). *Id.*

And CRAs may still continue to report favorable medical debt information (for example, when a consumer *does* pay their medical debts).

117.    The statute is thus content-based because it "singles out specific subject matter for differential treatment." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 619 (2020). It is, as a result, subject to strict scrutiny review. *Reed*, 576 U.S. at 163.

118.    HB 23-1126 is both over and underinclusive in its subject-matter based restriction of accurate commercial speech. HB 23-1126 restricts communications regarding nearly all unpaid medical debt. C.R.S. § 5-18-109(f)(2). The Legislature and HB 23-1126 did not articulate a legitimate state interest in suppressing this communication. And the statute is underinclusive because it exempts certain purposes (use of the credit report for a transaction involving the purchase of a one-unit property that exceeds the National Conforming Loan Limit value and favorable medical debt information) from the prohibition. *Id*.

119.    Moreover, HB 23-1126 destroys *all* available channels for the communication of accurate medical debt information.

120.    Because HB 23-1126 fails to narrowly tailor its restriction of speech, it fails First Amendment scrutiny.

121.    Separately, the statute fails under analysis reserved for content-neutral restrictions of protected commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 566 (1980). The statute restricts lawful speech, does not advance a substantial government purpose by direct means, and is both under- and over-inclusive in its restrictions. *See id*.

122.    HB 23-1126's continued impact immediately and irreparably harms Plaintiffs and

- 34 -

Plaintiff ACA's members.

35921573.1

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and award the following relief:

2.     A declaration that HB 23-1126 is expressly preempted by 15 U.S.C. § 1681t(b)(1)(E);

3.     A declaration that HB 23-1126 is expressly preempted by 15 U.S.C. § 1681c(a)(6);

4.     A declaration that HB 23-1126 is impliedly preempted by the FCRA;

5.     A declaration that HB 23-1126 violates the First Amendment;

6.     An order enjoining Defendant from enforcing HB 23-1126;

7.     An order awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

8.     Any other relief that the Court deems just and equitable.

35921573.1

Dated: November 5, 2025

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: */s/Sarah J. Auchterlonie*

Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
Adam E. Lyons, Bar No. 61816
alyons@bhfs.com
Eric D. Walther, Bar No. 61010
ewalther@bhfs.com
Courtney E. Bartkus, Bar No. 50193
cbartkus@bhfs.com

675 Fifteenth Street
Suite 2900
Denver, CO 80202
Telephone:      303.223.1100
Facsimile:      303.223.1111

and

Leah C. Dempsey
ldempsey@bhfs.com
DC Bar No. 1033593

600 Massachusetts Avenue, NW
Suite 400
Washington, DC 20001
Telephone:      202.296.7353
Facsimile:      202.296.7009

35921573.1